**Tiffany CHILDS, et al., Appellants,**

v.

**Samuel B. PURLL, Jr.,
et al., Appellees.**

**No. 03–CV–1451.**

District of Columbia Court of Appeals.

Argued March 8, 2005.
Decided Sept. 8, 2005.

**26.** Stewart has also attached to one of his post-argument submissions correspondence from the United States Attorney's office revealing possible misconduct on the part of one of the police officers involved in this case. This information has not been presented to the trial court, and we will not consider it as a part of this appeal. Any remedy that Stewart may have must be sought in the first instance in the trial court.

Jason A. Kerpelman, Washington, for appellants.

David A. Carter, with whom Douglas C. Meister, Riverdale, MD, was on the brief, for appellees Samuel B. Purll, Jr., and Kathy A. Purll.

Larissa N. Miller, with whom Frank F. Daily, Hunt Valley, was on the brief, for appellees Willoughby Real Estate Company, Lawrence F. Willoughby, Robert K. Willoughby, and David R. Willoughby.

Before WASHINGTON, Chief Judge,* and TERRY and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

This is an appeal from an award of summary judgment to the defendants in an action for damages on account of lead poisoning. We reverse the judgment in part and remand for further proceedings.

## I.

Between December 1991 and October 1995, appellants Marcella Childs and her two minor children, Tiffany Childs and Robbie Davis, resided as tenants in an apartment at 1411 Ridge Place in Southeast Washington, D.C. The property was owned by appellees Samuel and Kathy Purll and managed by appellee Willoughby Real Estate Company ("Willoughby"). Appellants' lease agreements identified Willoughby as the landlord and lessor and listed each member of the Childs family by name as an occupant of the premises. It was stated in the leases that Tiffany and Robbie were one and three years old, respectively, at the start of the tenancy in 1991. In August 1993, mid-way through the tenancy, tests revealed that the two children had elevated levels of lead in their blood—in other words, they had lead poisoning.

Attributing her children's lead poisoning to their exposure to lead-based paint at 1411 Ridge Place, Marcella Childs filed suit against the Purlls, Willoughby, and the management company's three principals[1] in February 2000. Her voluminous

---

* Judge Washington was an Associate Judge of the court at the time this case was argued. His status changed to Chief Judge on August 6, 2005.

1. Ms. Childs sued Lawrence, David and Robert Willoughby. Lawrence was the sole owner of the company, and David and Robert were company officers. It appears that David Willoughby signed the lease agreements on the company's (landlord's) behalf.

complaint[2] charged each defendant with negligence in failing to eradicate a lead paint hazard that persisted on the walls and other surfaces throughout the premises, failing to prevent the paint from chipping, peeling and flaking, and failing to warn her of the resulting dangers—"thereby rendering the dwelling unsafe and dangerous, and unfit for human habitation, especially for children of tender years." The complaint further asserted that, for leasing the dwelling in a grossly defective and unreasonably dangerous condition, the defendants were strictly liable without regard to negligence. In addition, the complaint alleged that the defendants had violated the Consumer Protection Procedures Act[3] by misrepresenting that appellants' apartment complied with the District of Columbia Housing Regulations despite the fact that it contained "flaking, loose or peeling paint or plaster, or lead-based paint accessible to children."

As a consequence of the defendants' actions, Ms. Childs alleged, her children had ingested lead-based paint and paint dust and, as a result, had suffered permanent brain damage and other serious injuries for which they were entitled to compensation. Ms. Childs also sought compensation for herself for the anguish she had suffered watching her children undergo painful drug tests and therapy, the expenses she had incurred for their medical care, and the loss of her children's services. Along with compensatory damages, the complaint requested punitive damages and, under the Consumer Protection Procedures Act, treble damages and reasonable attorneys' fees.

Following a lengthy period of discovery, the defendants moved for summary judgment on multiple grounds. Appellants failed to file a timely opposition to the motions. Four weeks after the filing deadline had passed, appellants' counsel moved for an additional fifteen days to submit an opposition. Although the trial court granted the request, appellants then filed nothing by the extended deadline. After three more weeks in which appellants were not heard from, the court issued an opinion and order on the morning of November 7, 2003, granting the motions for summary judgment on their merits.[4] The court ruled that appellants' negligence causes of action failed for lack of evidence that the defendants had notice of any lead paint hazard in appellants' dwelling, that District of Columbia law does not impose strict liability on a landlord or its agents for leasing property in a hazardous condition, and that appellants' Consumer Protection Procedures Act claims are precluded because the Act is not applicable to landlord-tenant relations and does not authorize the award of damages for personal injuries of a tortious nature. The court further ruled that the individual Willoughby defendants could not be held personally liable to appellants, inasmuch as "their actions were no more than those of an employee of the corporation" and the evidence did not jus-

---

**2.** We think it fair to observe that the 152–page pleading is prolix.

**3.** D.C.Code §§ 28–3901–3911 (2001).

**4.** The court specifically noted that it did not grant summary judgment merely because appellants had failed to oppose it. *See Lynch v. Meridian Hill Studio Apts., Inc.,* 491 A.2d 515, 520 (D.C.1985) (stating that absence of opposition "does not suffice to justify the granting of unopposed motions for summary judgment"); Super. Ct. Civ. R. 56(e) ("If the adverse party does not ... respond, summary judgment, *if appropriate,* shall be entered against the adverse party.") (emphasis added). On the other hand, "Rule 56(e) does permit the court to accept the moving party's verified version of the facts if it is not countered with specificity in a timely fashion." *Lynch,* 491 A.2d at 521.

tify "piercing the corporate veil." Finally, the court ruled that there was no evidence of willful, reckless or malicious conduct such as would be necessary to support appellants' claims for punitive damages, and that District of Columbia law does not recognize a parent's cause of action for loss of services of a minor child.

On the same day the trial court issued its decision, appellants moved to late file their opposition to summary judgment, asserting without explanation that they had not met the extended filing deadline due to "inadvertence, excusable neglect and/or circumstances beyond Plaintiffs' control." The following week, appellants filed a supplemental motion asking the court to reconsider its order of summary judgment pursuant to Superior Court Civil Rules 59 and 60(b). Appellants' counsel averred that he had been prevented from filing a timely opposition by "circumstances beyond his control," though he did not explain what those circumstances were.

The trial court treated the motion for reconsideration together with appellants' belated opposition to summary judgment

as a request for relief under Rule 60(b)(1)[5] —even though, the court stated, "plaintiffs' counsel has done little to explain why the opposition was filed two months after it was originally due and almost one month after the extension deadline expired"—and denied the request on January 30, 2004. Adhering to its initial rulings, the court found that appellants still had demonstrated no genuine issues of material fact that would enable them to overcome the defendants' motions for summary judgment.[6]

## II.

In this court, appellants contend that the trial court erred in rejecting their negligence and Consumer Protection Procedures Act claims and their effort to hold Willoughby's owner and officers personally liable. Appellants do not challenge the trial court's other rulings on summary judgment.

 "In reviewing a trial court's grant of summary judgment, we make an independent review of the record and employ the same standards as does the trial court in initially considering the motion."

---

5. Superior Court Civil Rule 60(b)(1) permits the court to relieve a party from a final judgment on grounds of "[m]istake, inadvertence, surprise, or excusable neglect."

6. While appellants' motion for reconsideration was still pending before the trial court, they filed a notice of appeal from the court's initial grant of summary judgment. On January 28, 2004, we issued an order to show cause why the appeal should not be dismissed for lack of jurisdiction. *See Carter v. Cathedral Ave. Coop., Inc.*, 532 A.2d 681, 683 (D.C. 1987) (noting, *inter alia,* that a notice of appeal is premature and subject to dismissal if it is filed during the pendency of a timely motion to alter or amend a judgment pursuant to Rule 59(e)). After the trial court denied appellants' motion for reconsideration on January 30, 2004, we discharged the order to show cause. *See Carter,* 532 A.2d at 683 (explaining that where the trial court makes an "effective" ruling on the motion to alter or

amend its judgment before this court disposes of the premature appeal, we have "treated the premature notice of appeal as effectively permitting us to rule on the appeal, since the required further action by the trial court ha[s] in fact been performed by that time").

Appellants did not, however, file a second notice of appeal from the trial court's denial of their motion for reconsideration. This was a potentially significant oversight inasmuch as appellants' late-filed opposition to summary judgment arguably presented the trial court with new evidence. Appellees contend that our jurisdiction on appeal is therefore limited to considering the trial court's initial ruling, and that we lack jurisdiction to review the subsequent ruling denying reconsideration. As will be seen, given the view we take of appellants' claims, it is unnecessary to reach this somewhat complicated jurisdictional issue.

*Croce v. Hall,* 657 A.2d 307, 309–10 (D.C. 1995). We therefore must determine whether the party awarded summary judgment demonstrated that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. We view the record in the light most favorable to the non-moving party. *Settles v. Redstone Dev. Corp.,* 797 A.2d 692, 694 (D.C.2002).

### A. Negligence

▆▆▆ "Generally, in order to prevail on a claim of negligence, the plaintiff must establish a duty of care, a deviation from that duty, and a causal relationship between that deviation and an injury sustained by the plaintiff." *Youssef v. 3636 Corp.,* 777 A.2d 787, 792 (D.C.2001). Issues of negligence frequently "are not susceptible of summary adjudication, but should be resolved by trial in the ordinary manner." *Croce,* 657 A.2d at 310 (internal quotation marks and citation omitted). "However, the question of whether a defendant owes a duty to a plaintiff under a particular set of circumstances is 'entirely a question of law ... [that] must be determined only by the court.'" *Id.* (quoting W. PAGE KEETON, PROSSER AND KEETON ON TORTS § 37, at 236 (5th ed.1984)).

▆▆ In finding that appellants' claims of negligence did not survive summary judgment, the trial court proceeded from the premise that a landlord owes no duty to a tenant for failing to prevent or remedy a hazardous condition in leased premises unless the landlord had either actual or constructive notice of the condition. *See, e.g., Youssef,* 777 A.2d at 794. Although the defendants did not deny the presence of lead paint on the walls of appellants' apartment, the court found it undisputed that none of the defendants was aware of any lead paint hazard there. The court accurately summarized the undisputed evidence as follows:

> Plaintiffs fail to show evidence disputing that no defendant, Purll or Willoughby, ever received a lead paint violation [notice] regarding the property from the District of Columbia, and that no defendant was ever told by Ms. Childs that a lead paint hazard existed. Moreover, plaintiffs cannot deny that Ms. Childs inspected the apartment before signing her lease agreement and subsequently signed the lease agreement, acknowledging the good condition of the property.[7] Prior to her moving in, paint repairs were promptly made at her request and no further complaints were made regarding any paint problems.[8] This evidence undisputedly illustrates that neither the Purll nor Willoughby defendants had notice of any lead hazard, and therefore, did not and could not breach their duty.

As the court also noted, "the most" that appellants could show was that defendants occasionally inspected their apartment during their tenancy and might have been

---

7. The lease agreement contained a clause in which the tenant acknowledged the "good condition" of the premises. In bold print, the clause stated that the tenant had "made a thorough inspection of the premises," including "the condition of all of the floors, walls, ceilings"; that the tenant had "found such floors, walls and ceilings without defect, cracks or holes"; and that the tenant had "not found any other condition which requires any repair."

8. At the time she moved in, Ms. Childs complained about chipping paint and Mr. Purll promptly repainted the premises. Although Ms. Childs requested repainting on occasion during her tenancy because of wear and tear, which was done, she never again complained of flaking or peeling paint.

physically present at times when paint was peeling and chipping. There was no evidence, however, that any defendant "actually saw what was later determined to be lead paint."

We see no reason to disturb the trial court's determination that the defendants had no notice, actual or constructive, that lead paint was chipping, peeling or flaking from the walls during appellants' tenancy. As appellants point out, however, that is not the end of the inquiry. Irrespective of such notice, the question remains whether the defendants may be found negligent simply for leasing an apartment with lead paint on the walls to appellants, because that condition in itself constituted a violation of the District of Columbia Housing Regulations and created a health hazard. This is a question that the trial court appears not to have considered.

The Housing Regulations set forth in Title 14 of the District of Columbia Municipal Regulations were promulgated to preserve and promote "the public health, safety, welfare, and morals through the abatement of certain conditions affecting residential buildings and areas, including dilapidation, inadequate maintenance, . . . and other unsanitary or unsafe conditions." D.C. Mun. Regs. tit. 14, § 100.2 (2005). To those ends, the Housing Regulations impose numerous duties on landlords and their agents to keep residential premises safe and habitable, and not to rent habitations that are unsafe.[9] Of particular pertinence to this case, during the time appellants resided at 1411 Ridge Place, § 707.3 of Title 14 provided as follows:

> The owner[10] of any residential premises in which there resides a child under the age of eight (8) years . . . shall maintain the interior and exterior surfaces of the residential premises free of lead or lead in its compounds in any quantity exceeding five-tenths (0.5) of one percent (1%) of the total weight of the material or more than seven-tenths of a milligram per square centimeter (0.7 mg/cm$^2$), or in any quantity sufficient to constitute a hazard to the health of any resident of the residential premises or any regular visitor to the residential premises who spends a substantial portion of his or her time in the residential premises.[11]

9. The Housing Regulations provide that "[n]o owner, licensee, or tenant shall occupy or permit the occupancy of any habitation in violation of this subtitle." D.C. Mun. Regs. tit. 14, § 400.1. "The owner or licensee of each residential building shall provide and maintain the facilities, utilities, and services required by this subtitle." Id. § 400.4. "No person shall rent or offer to rent any habitation, or the furnishings of a habitation, unless the habitation and its furnishings are in a clean, safe, and sanitary condition, in repair, and free from rodents or vermin." Id. § 400.3.

10. The Housing Regulations define the term "owner" expansively, as:

any person who, alone or jointly or severally with others, meets either of the following criteria:

(a) Has legal title to any building arranged, designed, or used (in whole or in part) to house one or more habitations; or

(b) Has charge, care, or control of any building arranged, designed or used (in whole or in part) to house one or more habitations, as owner or agent of the owner, or as a fiduciary of the estate of the owner or any officer appointed by the court. Any persons representing the actual owner shall be bound to comply with the terms of this subtitle, and any notice or rules and regulations issued pursuant to this subtitle, to the same extent as if he or she were the owner.

D.C. Mun. Regs. tit. 14, § 199.

11. Section 707.3 was originally adopted in slightly different form as part of the Lead–Based Paint Poisoning Prevention Act of 1983, D.C. Law 5–35, 30 D.C.Reg. 4156 (Aug. 19, 1983). The section has recently been amended to read as follows:

This provision was intended to protect children from the grave health hazard created by exposure to lead-based paint. Young children, "whose nervous systems are still developing, are particularly vulnerable to the damage caused by lead poisoning. High blood lead levels can produce brain damage, coma or death, and even relatively low levels can lead to significant nervous system damage." *Juarez v. Wavecrest Mgmt. Team Ltd.*, 88 N.Y.2d 628, 649 N.Y.S.2d 115, 672 N.E.2d 135, 139 (1996) (citations omitted).

■ Appellants may be able to prove that their tenancy at 1411 Ridge Place was in violation of § 707.3, as it is undisputed that the landlord and its management company were notified in the lease agreements that Tiffany Childs and Robbie Davis were under eight years of age, and the defendants have made no showing that the dwelling they leased to appellants was lead-free within the meaning of the regulation.

■ "The general rule in this jurisdiction is that where a particular statutory or regulatory standard is enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred, and the plaintiff can establish his relationship to the statute, unexplained violation of that standard renders the defendant negligent as a matter of law." *Chadbourne v. Kappaz*, 779 A.2d 293, 295 (D.C.2001) (internal quotation marks and citations omitted); *see also Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268, 1273 (D.C. 1987) ("The rule that violation of an ordinance intended to promote public safety is negligence ... is rooted in the principle that failure to comply with a statutory requirement designed to protect public safety is to fall short of the standard of diligence to which those who live in organized society are under a duty to conform.") (internal quotation marks, brackets and citations omitted).[12] This general rule has long been applied to violations of the Housing Regulations. *See, e.g., Whetzel v. Jess Fisher Mgmt. Co.*, 108 U.S.App. D.C. 385, 392–93, 282 F.2d 943, 950–51 (1960).

■ Subject to the foregoing principles, we have said that "the Housing Regulations impose only a duty of reasonable care upon owners of rental property." *Scoggins v. Jude*, 419 A.2d 999, 1005 (D.C. 1980). Similarly, we have stated as a general proposition that "[t]he Housing Regu-

The owner of any residential premises in which there resides a child under the age of 8 years or to which a child under the age of 8 years is a regular visitor who spends a substantial portion of his or her time in the premises, shall maintain the interior and exterior surfaces of the residential premises free of lead-based paint hazards as defined by the United States Environmental Protection Agency in 40 C.F.R. § 745.65(a) through (c).

D.C. Act 15–769, 52 D.C.Reg. 2627 (Mar. 18, 2005).

12. "Therefore," we have explained,
[w]here a party violates a statute, and the violation is a proximate cause of an injury which the statute was designed to prevent, there is a rebuttable presumption of negligence on the part of the violator.... If,

however, the defendant produces evidence tending to excuse or explain the violation, the violation may be considered evidence of negligence rather than negligence *per se* .... [I]f the violator demonstrates that she did everything a reasonably prudent person would have done to comply with the law, then her violation merely constitutes evidence of negligence rather than negligence *per se.*

*Chadbourne*, 779 A.2d at 295–96 (citations and quotation marks omitted); *see also Zhou*, 534 A.2d at 1274. (For the sake of completeness, it should be noted that "even where the court does not perceive a public safety purpose in the legislative enactment, the statutory violation may be admitted as evidence of negligence, although it does not constitute negligence *per se.*" *Id.*)

lations do not impose immediate and unconditional liability upon a landlord for code violations but, instead, contemplate sanctions only if repairs are not effected after actual or constructive notice of the defect reaches the landlord." *George Washington University v. Weintraub,* 458 A.2d 43, 47–48 (D.C.1983).[13] But "[s]uch notice need not be given by the tenant," nor by "official notice" of a violation from the municipal authorities, "if the landlord, in the exercise of reasonable care, could have become aware of the defective condition." *Id.* at 48 & n. 8. Thus, a landlord's duty is to "exercise reasonable care to maintain rental premises in compliance with the housing code." *Id.* at 49. Generally speaking, a landlord who fulfills that duty "may not therefore properly be held liable to a tenant for losses that arise from defective conditions he neither knew of nor had reason to know about or that could not be foreseen or prevented." *Id.*[14]

In § 707.3, we have before us a particular Housing Regulation that is designed to protect public safety and that requires landlords to be proactive when its specified preconditions are satisfied. Upon notification that the prospective tenants of 1411 Ridge Place would include children under eight years of age, § 707.3 imposed a specific, affirmative duty on the owners and their agents to provide those premises to the Childs family in a lead-free condition or not at all.[15] Although the Purlls and their management company may not have known there was lead paint in the premises, "actual knowledge [of the defect] is not required for liability; it is enough if, in the exercise of reasonable care, appellee[s] should have known that the condition ... violated the standards of the Housing Code." *Whetzel,* 108 U.S.App. D.C. at 393, 282 F.2d at 951. "Ordinarily, the landlord will be chargeable with notice of conditions which existed prior to the time that the tenant takes possession," RESTATEMENT § 17.6 cmt. c, and the creation in § 707.3 of an affirmative duty to furnish lead-free premises implies a concomitant, antecedent duty to

13. Although our opinion in *Weintraub* addressed the landlord's liability for breaching the implied warranty of habitability rather than for negligence, the applicable principles are the same.

14. The governing principle is stated correctly in the RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT (1977) (hereinafter, "RESTATEMENT") as follows:
 A landlord is subject to liability for physical harm caused to the tenant and others upon the leased property with the consent of the tenant ... by a dangerous condition existing before or arising after the tenant has taken possession, if he has failed to exercise reasonable care to repair the condition and the existence of the condition is in violation of:
 (1) an implied warranty of habitability; or
 (2) a duty created by statute or administrative regulation.
 *Id.* § 17.6. "The landlord is subject to liability under the rules of this section only for conditions of which he is aware, or of which he could have known in the exercise of reasonable care." *Id.* § 17.6 cmt. c.

15. Appellees suggest that § 707.3 does not require an owner to provide lead-free premises if a child under eight is to be an occupant, but only to avoid using lead-based paint when performing maintenance or repairs in such premises. We are not persuaded by such a narrow reading of a provision that categorically requires owners of premises occupied by children to "maintain" them free of lead. Indeed, contrary to appellees' reading, the section of the Housing Regulations immediately following § 707.3 states that the Director of the government agency responsible for enforcement of housing regulations "shall" order the owner of residential premises in which a lead-based paint hazard is found to "eliminate" the hazard by an approved method such as removing the paint entirely or covering it with a durable material. D.C. Mun. Regs. tit. 14, § 707.4.

ascertain whether the premises in fact are lead-free. In effect, § 707.3 presumptively serves to put the landlord on constructive notice of any lead paint hazard in premises occupied by children under eight. *See Juarez*, 649 N.Y.S.2d 115, 672 N.E.2d at 137 (holding that under a New York City lead abatement provision similar to § 707.3, a landlord who has actual or constructive notice that a child under seven years of age is residing in one of its apartment units "is chargeable with notice of any hazardous lead condition in that unit," and therefore is liable for damages in the event the child suffers lead poisoning from exposure to that condition). Moreover, on the record as it currently stands, no reason appears why the lead paint hazard at 1411 Ridge Place could not have been detected before Tiffany Childs and Robbie Davis were exposed to it; nor does the record establish that the Purlls took measures to eliminate the hazard, either before appellants' tenancy commenced or at any time thereafter.

■ In sum, the requirement of constructive notice is satisfied in this case, given § 707.3 and the notice to the landlord that two young children would be residing in the leased premises. Further, it cannot be said as a matter of law that the owners and their agents in this case have demonstrated that the alleged violation of a regulation designed to promote public safety was "excusable under the circumstances or [that] other acts of due care negate the negligence implied by the statutory violation." *Zhou*, 534 A.2d at 1277. In seeking summary judgment, the defendants have not presented evidence that they "did everything a reasonably prudent person would have done to comply with" § 707.3. *Chadbourne*, 779 A.2d at 295. We therefore are persuaded that the defendants were not entitled to summary judgment on appellants' cause of action for

negligence based on their claimed lack of notice of the lead paint hazard at the leased premises. Accordingly, we reverse that portion of the trial court's judgment.

## B. Consumer Protection Procedures Act

■ Whether the Consumer Protection Procedures Act authorizes appellants to seek enhanced relief for the defendants' alleged misrepresentations concerning the condition of the apartment rented to appellants at 1411 Ridge Place presents a question of law. As appellants contend, the Act was amended in March 1991 (before the commencement of appellants' tenancy) to prohibit deceptive trade practices in real estate sales and lease transactions with consumers, *see DeBerry v. First Gov't Mortgage & Investors Corp.*, 743 A.2d 699, 701–02 & 702 n. 8 (D.C.1999); and the Act authorizes consumers aggrieved by prohibited trade practices to bring private civil actions in Superior Court for treble damages and other relief, *see* D.C.Code § 28–3905(k)(1). Nonetheless, we conclude the trial court was correct in ruling as a matter of law that appellants' misrepresentation claims cannot be pursued under the Consumer Protection Procedures Act because those claims (1) seek damages for personal injury of a tortious nature and (2) arise in the context of landlord-tenant relations.

In 1991, when appellants' misrepresentation cause of action arose, § 28–3905(k)(1) provided as follows:

Any consumer who suffers any damage as a result of the use or employment by any person of a trade practice in violation of a law of the District of Columbia *within the jurisdiction of the Department* [of Consumer and Regulatory Af-

fairs][16] may bring an action in the Superior Court of the District of Columbia to recover or obtain any of the following:

 (A) treble damages;

 (B) reasonable attorneys' fees;

 (C) punitive damages;

 (D) any other relief which the court deems proper.

D.C.Code § 28–3905(k)(1) (1991) (emphasis added). We have construed the italicized language to mean that where the Act limits the jurisdiction of the Department of Consumer and Regulatory Affairs, "the scope of the cause of action created by § 28–3905(k)(1) is similarly limited." *Diamond v. Davis*, 680 A.2d 364, 365–66 n. 2 (D.C.1996).

The Act limits the jurisdiction of the Department in a number of substantive ways; of pertinence to the present case, the Act specifically states that the Department may not (1) "order damages for personal injury of a tortious nature," or (2) "apply the [complaint adjudication] provisions of section 28–3905 to ... landlord-tenant relations; ..." D.C.Code § 28–3903(c). It follows from *Diamond* that former § 28–3905(k)(1) is subject to the same substantive limitations, *i.e.*, it does not authorize a private action in Superior Court where the claim (1) seeks damages for personal injury of a tortious nature, or (2) arose in the context of landlord-tenant relations.

The Council of the District of Columbia amended § 28–3905(k)(1) in October 2000 (after appellants filed their lawsuit) so that the subsection no longer explicitly links the scope of private civil actions to the jurisdiction of the Department of Consumer and Regulatory Affairs.[17] We need not decide, however, whether the Council intended thereby to expand the private right of action, for even if it did, there is no indication that the Council intended any such expansion to be retroactive. *See Mayo v. District of Columbia Dep't of Employment Servs.*, 738 A.2d 807, 811 (D.C.1999) ("[A] retrospective operation will not be given to a statute ... unless such be the unequivocal and inflexible import of the terms.") (internal quotation marks and citations omitted); *District of Columbia v. Gallagher*, 734 A.2d 1087, 1093 (D.C.1999) ("[S]tatutes are not to be given retroactive effect or construed to change the status of claims fixed in accordance with earlier provisions unless the legislative purpose so to do plainly appears.") (internal quotation marks and citation omitted). *See generally Landgraf v. USI Film Prods.*, 511 U.S. 244, 264–80, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

---

**16.** The Department of Consumer and Regulatory Affairs is the governmental agency primarily responsible for enforcing the Consumer Protection Procedures Act. *See* D.C.Code § 28–3902(a).

**17.** The subsection now reads as follows:

A person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia and may recover or obtain the following remedies:

(A) treble damages, or $1,500 per violation, whichever is greater, payable to the consumer;

(B) reasonable attorney's fees;

(C) punitive damages;

(D) an injunction against the use of the unlawful trade practice;

(E) in representative actions, additional relief as may be necessary to restore to the consumer money or property, real or personal, which may have been acquired by means of the unlawful trade practice; or

(F) any other relief which the court deems proper.

D.C.Code § 28–3905(k)(1) (2001).

As we conclude that appellants' Consumer Protection Procedures Act claims are subject to the limitations inherent in former D.C.Code § 28–3905(k)(1), we affirm the trial court's decision to award summary judgment on those claims to the defendants. The claims are precluded because they purport to apply the Act to a transaction that arose in a landlord-tenant relationship, and because they seek damages for personal injuries of a tortious nature.

### C. The Individual Willoughby Defendants

▮▮ As an additional reason for granting summary judgment to Lawrence, David and Robert Willoughby, the trial court ruled that appellants proffered no evidence that they created or used their management company to perpetrate fraud.[18] Appellants argue that the court erred in viewing their effort to hold the individual Willoughby defendants personally liable as merely a failed attempt to "pierce the corporate veil." Rather, appellants argue, since Lawrence, David and Robert Willoughby ran the management company together and were its only officers and decision-makers, it can be inferred that the company's torts were committed by them personally. We agree with appellants that the trial court's analysis, while not incorrect as far it went, did not go far enough.

▮▮▮▮ Even absent grounds to pierce the corporate veil, "corporate officers are not shielded by the limited liability of the corporation for liability for their own tortious acts." *Camacho v. 1440 Rhode Island Ave. Corp.*, 620 A.2d 242, 246 (D.C. 1993). "They are individually liable for the torts which they 'commit, participate in, or inspire,' even though the acts are performed in the name of the corporation." *Id.* (quoting *Vuitch v. Furr*, 482 A.2d 811, 821 (D.C.1984)). Therefore, we have reiterated, "corporate officers, charged in law with affirmative official responsibility in the management and control of the corporate business, cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval." *Vuitch*, 482 A.2d at 821 (citations omitted). "Sufficient participation [for the attachment of liability] can exist when there is an act or omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense." *Id.; accord,*

---

**18.** The trial court explained its ruling on this point as follows:

Fundamentally, a corporation is an entity that is utterly separate and distinct from its shareholders and officers. *McAuliffe v. C and K Builders, Inc.*, 142 A.2d 605, 607 (D.C.1958); *Vuitch v. Furr*, 482 A.2d 811 (D.C.1984). "Thus, before the acts and obligations of a corporation can be legally recognized as those of a particular person, the party seeking to disregard the corporate entity has the burden of showing by *affirmative proof* that a unity of ownership and interest exists and that the corporation was created or used for the purpose of perpetuating fraud or wrong." *McAuliffe, supra*, at 607 (emphasis in original). Here, the plaintiff has produced no such proof.

There is certainly no hint that the formation of the corporation was effectuated for fraudulent purposes, and the plaintiff has never claimed as much. The plaintiff has not come forward with any proof that the existence of the corporation was "used" for perpetuating fraud or wrong. This term implies that the proof must consist of evidence that the individual knew of the "fraud or wrong" and thereafter took refuge behind the corporate veil in order to avoid personal liability. Nothing of the sort has been demonstrated.

*Camacho,* 620 A.2d at 247; *see also Snow v. Capitol Terrace, Inc.,* 602 A.2d 121, 127 (D.C.1992).

The trial court erred in not evaluating the negligence claims against Lawrence, David and Robert Willoughby in accordance with the foregoing legal standards. We think the prudent course is not to attempt to apply those standards ourselves, but instead to remand the case for the trial court to do so in the first instance. It is true that, "[a]s a reviewing court, we are not limited to reviewing the legal adequacy of the grounds the trial court relied on for its ruling; if there is an alternative basis that dictates the same result, a correct judgment must be affirmed on appeal." *Kerrigan v. Britches of Georgetowne, Inc.,* 705 A.2d 624, 628 (D.C.1997) (citing, *inter alia, Marinopoliski v. Irish,* 445 A.2d 339, 340 (D.C.1982)). Here, however, the issue of the individual Willoughby defendants' personal liability is a multifaceted factual question, and one that is not clearly presented by the existing, rather sparse, evidentiary record on appeal. Based on our own examination of that record, we are not prepared at this juncture to conclude that the individuals cannot be found personally responsible for any torts of negligence against appellants. The particular facts, cited by the trial court in its decision, that David and Robert Willoughby never inspected or even visited appellants' apartment during the term of their lease,[19] were not directly involved in the management of the property during that period of time, and were not aware that a lead paint hazard existed on the premises, are not dispositive; for David and Robert Willoughby's alleged negligence essentially was in allowing their company to rent an apartment with lead-based paint to appellants in violation of the Housing Regulations and without warning appellants of the lead poisoning danger to which they were exposed. The additional fact, also cited by the trial court, that Willoughby's management contract with the Purlls provided that Samuel Purll would be responsible for all repairs, likewise seems beside the central point.

### III.

For the foregoing reasons, we partially reverse the trial court's award of summary judgment to the defendants and remand the case for further proceedings consistent with our opinion. Specifically, we hold that the defendants were not entitled to summary judgment based on their lack of notice of a lead paint hazard in appellants' apartment, because the defendants were on notice that children under eight years of age would be occupying the apartment, and the Housing Regulations impose an affirmative obligation on landlords to maintain lead-free premises where such children reside. We further hold that the individual Willoughby defendants were not entitled to summary judgment merely because they acted in the name of their corporation and the corporation was not created or used to perpetrate fraud. In all other respects, we uphold the trial court's judgment. We agree with the trial court that appellants' consumer protection claims are not authorized by the Consumer Protection Procedures Act, both because that Act is inapplicable to landlord-tenant relations and because appellants are seeking damages for personal injuries of a tortious nature. We do not address the trial court's other rulings, relating to strict

---

**19.** The Willoughby defendants proffered testimony with their summary judgment motion that an unidentified representative of the management company inspected appellants' apartment at least once a year and it appears to be conceded that Lawrence Willoughby himself did visit the premises from time to time.

liability, punitive damages and loss of services; those rulings stand because appellants have not challenged them.

*So ordered.*